**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:01cr150** |
| | ) | |
| **JAY E. LENTZ** | ) | |

## MEMORANDUM OPINION

Following a jury verdict in this kidnapping and murder prosecution, the trial judge entered a judgment of acquittal and granted the defendant's motion for a new trial. The Court of Appeals for the Fourth Circuit later overturned the judgment of acquittal, but upheld the trial court's decision to grant a new trial because certain prejudicial evidence that had been excluded in the course of the trial had found its way into the jury room. *See United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004) (*Lentz II*). The matter has now been remanded for a new trial before a different judge. In preparation for the new trial, the government seeks reconsideration of certain evidentiary rulings made by the original judge in the course of the first trial, which raises significant questions concerning the "law of the case" doctrine. The principles underlying this doctrine, their application here and the particulars of the evidentiary rulings the government seeks to revisit are addressed here.

## I.

A brief summary of the underlying kidnapping for murder prosecution and the procedural history of this case provides the context essential to a full understanding of the questions presented.[1] Defendant Jay E. Lentz ("Lentz") and Doris Lentz ("Doris") were married in 1989 and their only child, Julia, was born in 1991. Throughout the course of the marriage, Lentz was verbally and

---

[1]  A more detailed recitation of the facts of the case is set forth in *Lentz II*.

physically abusive toward Doris.  The couple separated in 1993 and the marriage ultimately ended in divorce in 1995, after which Lentz resided in Maryland and Doris resided in Virginia.  A bitter dispute concerning various child support, child support arrearage, and marital property distribution issues thereafter ensued in a Maryland state court.  In this regard, on March 29, 1996, the state court ordered the garnishment of Lentz's wages to satisfy his child support obligations;  he was also subject to a court order requiring him to pay Doris $28,000 for her share of certain marital property, as well as one half of the proceeds from the anticipated sale of the marital residence.  A hearing concerning these and other issues was scheduled in state court for April 24, 1996.

Doris disappeared on April 23, 1996, the day before the scheduled court hearing.  In her last reported conversation that evening, she told a friend that she intended to leave her home in Virginia to pick up her daughter from Lentz's home in Maryland.  Yet, no eyewitness ever saw Doris arrive at Lentz's house that evening.  Indeed, no one ever saw or heard from Doris again and her body was never found.  Instead, on April 28, 1996, five days after her disappearance, authorities located Doris's abandoned car in a District of Columbia parking lot on a route between the homes of the estranged couple, approximately eight miles from Lentz's home.  The individual who reported the abandoned vehicle said that she first saw it there on April 24.  The doors of the car were unlocked, Doris's purse was in plain view, and the keys were visible on the passenger side floor.  The driver's seat was in a position that would have accommodated a tall driver such as Lentz, who is six feet tall, but not Doris, who was only slightly more than five feet tall.  The interior of the vehicle was dirty and stained with blood.  Subsequent DNA testing revealed that nearly all of the blood stains contained Doris's DNA, yet one stain contained a match for Lentz's DNA.

The government's theory of the case is that Lentz, enraged by the ongoing state court battle

concerning custody and property distribution issues, planned and carried out Doris' murder.  Indeed, Lentz allegedly told two individuals in the course of a conversation about his divorce proceedings that "I'll kill her [Doris] first before Julia is taken from me."  According to the government, Lentz lured Doris from Virginia to his home in Maryland on the false pretense that she would be able to retrieve Julia.  At the time, however, Julia was still in Indiana visiting Lentz's parents and was not scheduled to return until a few days later.  Thus, the government claims that Lentz inveigled Doris to come to his home on the pretense of picking up Julia and when Doris arrived at Lentz's home on the evening of April 23, 1996, Lentz held her, killed her, and subsequently disposed of her body.

Although an investigation began immediately after Doris' disappearance, Lentz was not indicted in federal court for her kidnapping and murder until five years later, on April 24, 2001.  He was incarcerated shortly thereafter and has remained in custody since that time.  During the summer of 2003, Lentz was tried and convicted by a jury of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).  Following the jury verdict, the trial judge entered a judgment of acquittal and granted Lentz's motion for a new trial.  *See United States v. Lentz*, 275 F. Supp. 2d 723 (E.D. Va. 2003); *United States v. Lentz*, No. 1:01cr150 (E.D. Va. Jan. 29, 2004) (Memorandum Opinion). Subsequently, on appeal, the Court of Appeals overturned the judgment of acquittal, but upheld the trial court's decision to grant a new trial because certain prejudicial evidence that had been excluded in the course of the trial had found its way into the jury room.  *See United States v. Lentz*, 383 F.3d 191, 195 (4th Cir. 2004) (*Lentz II*).  Accordingly, the matter was remanded for a new trial before a different district judge, at which point the case was randomly assigned to this Court.

The retrial was initially scheduled for January 31, 2005, but was later continued until July 11, 2005 to accommodate the trial schedule of one of Lentz's attorneys.  *See United States v. Lentz*,

3

Case No. 1:01cr150 (E.D. Va. Dec. 22, 2004) (Order).  The retrial is now scheduled to commence on November 28, 2005.  In preparation for the new trial, the government seeks reconsideration of several evidentiary rulings made by the original trial judge.  This motion presents the threshold question whether the judge presiding over the retrial is bound by the previous evidentiary rulings rendered by the original trial judge or by the Fourth Circuit under the "law of the case" doctrine.

## II.

The starting point in the analysis is a review of the legal principles underlying the "law of the case" doctrine.[2]  At its simplest, this well-established doctrine essentially provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  This rule of practice "promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson*, 486 U.S. at 816 (citation omitted).  Indeed, a "fundamental precept of common law adjudication is that an issue once determined by a competent court is conclusive." *Arizona v. California*, 460 U.S. at 618 (collecting cases).  Thus, the law of the case doctrine precludes "parties from contesting matters that they have had a full and fair opportunity to litigate (and) protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."

---

[2]    The Fourth Circuit noted in *Lentz II* that "[a]lthough the district judge is very familiar with the case and has already ruled upon various issues, the grant of a new trial wipes the slate clean." *Lentz II*, 383 F.3d at 222.  While this statement, at first glance, arguably supports the conclusion that this Court is not bound by the various evidentiary rulings made by the first trial judge, it is hardly dispositive of the issue given that the Fourth Circuit was not specifically focused on the law of the case doctrine in *Lentz II.*  Rather, the Fourth Circuit, in making that particular statement, was merely supporting its decision to reassign the case to a different judge for retrial.

4

*Montana v. United States*, 440 U.S. 147, 153-54 (1979).

It is important to note that the law of the case doctrine is "not absolute nor inflexible." *Capital Investors Co. v. Executors of Morrison's Estate*., 584 F.2d 652, 654 (4th Cir. 1978). Indeed, the doctrine "is a rule of discretion...not a jurisdictional requirement." *Smith v. Bounds*, 813 F.2d 1299, 1304 (4th Cir. 1987) (citing *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985) (stating that the "law of the case doctrine is not an 'inexorable command, but rather a salutary rule of practice designed to bring an end to litigation, discourage '[j]udge shopping,' and ensure the obedience of lower courts.") (citations omitted).  And, application and force of the law of the case doctrine varies significantly depending on whether the subject ruling was rendered by a parallel trial court, or instead by an appellate or superior court.

With respect to appellate rulings, in particular, it is well settled that "once a case has been decided on appeal and a mandate issued, the lower court may not deviate from that mandate but is required to give full effect to its execution."  *See Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414 (4th Cir. 2005) (citing *Stamper v. Baskerville*, 724 F.2d 1106, 1107 (4th Cir. 1984)).  This so-called "mandate rule" is a "more powerful version of the law of the case doctrine and is based on the principle than an inferior tribunal is bound to honor the mandate of a superior court within a single judicial system."  *Invention*, 413 F.3d at 414 (citations and internal quotation marks omitted). Under this rule, therefore, an inferior court generally may not consider questions that the mandate of a superior court has laid to rest.  *See id.* at 415 (citing *Sprague v. Ticonic National Bank*, 307 U.S. 161, 168 (1939)).  Yet, the mandate rule itself is not without exceptions.  Indeed, the Fourth Circuit has recognized that the decision of an appellate court need not be followed in a later proceeding in the same case if "(1) a subsequent trial produces substantially different evidence, (2) controlling

5

authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (citing *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)).[3]

Evidentiary rulings rendered by a coordinate court, as opposed to an appellate court, are subject to a less stringent analysis. To begin with, it is clear that such rulings are not entitled to binding effect, unlike most rulings issued by a superior court. Indeed, "whether rulings by one district judge become binding as 'law of the case' upon subsequent district judges is not a matter of rigid legal rule, but more a matter of proper judicial administration which can vary with the circumstances." *See Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 290 (4th Cir. 1982). Thus, depending on the circumstances, "[i]t may be proper for a district judge to treat earlier rulings as binding, sometimes not." *Id.; see also Brown v. Slenker*, 197 F. Supp. 2d 497, 504 (E.D. Va. 2002) (rulings of district court, while law of the case, are "subject to reconsideration") (citing 18 Charles Alan Wright et al., Federal Practice and Procedure § 4478 (1981)); *Bradley v. Carydale Enterprises*, 730 F. Supp. 709, 723 n.14 (E.D. Va. 1989). Thus, "a court has the power to revisit prior decisions of its own or of a coordinate court in any circumstances, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson*, 486 U.S. at 817.[4]

---

[3]   *See also Aramony*, 166 F.3d at 662 (stating that the mandate rule "can be avoided in the following extraordinary circumstances: '(1) a showing that controlling legal authority has changed dramatically; (2) that significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; or (3) that a blatant error in the prior decision will, if uncorrected, result in a serious injustice'") (quoting *United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993)).

[4]   Defendant suggests that the evidentiary rulings made in the course of the first trial must be deemed binding and immutable law of the case for purposes of the second trial. Taken to its logical extreme, this unpersuasive argument would require the judge presiding over the retrial to

It is through the lens of these general legal principles that the specific evidentiary issues raised in the government's motion must be viewed.   Each issue is separately addressed.

A.    Doris' statements

Prior to the first trial, the government filed a motion in limine seeking to admit a number of out-of-court statements made by Doris to other individuals, arguing that such statements fell within various exceptions to the hearsay rule.   Among the hearsay exceptions relied on by the government in this regard was the forfeiture by wrongdoing provision set forth in Rule 804(b)(6), Fed. R. Evid.,[5] which provides an exception in circumstances where the party against whom the hearsay statement is offered either engaged or acquiesced in wrongdoing that resulted in the out-of-court declarant's unavailability to testify.   On May 14, 2002, the original trial judge issued a lengthy opinion granting the government's motion in limine in part, and denying it in part.   *See United States v. Lentz*, 282 F. Supp. 2d 399 (E.D. Va. 2002).   Excluded by the original trial judge were six statements allegedly made by Doris prior to her disappearance in which she indicated to others that Lentz had hinted that he might kill her or in which she expressed the belief that he might kill her.   The six specific statements are as follows:

(i)      Doris' statement in late 1995 to a pastor at her church, Lauren Gough, that Lentz told

---

follow every ruling the original trial judge made in the course of the first trial, regardless of whether those rulings were made erroneously or had subsequently been affected by additional evidence or otherwise.   This clearly is not required.   Instead, as long as a case remains open and there is good cause to do so, there must likewise remain the discretionary power to alter or amend previous rulings made in the course of the same case.

[5]      That section provides that "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness" is not precluded by the hearsay rule if the declarant is unavailable as a witness.   Rule 804(b)(6), Fed. R. Evid.

her that "if O.J. [Simpson] can get away with it, so can I,"

(ii)     Doris' statement during the Fall of 1995 to another pastor at her church, Victoria

Heard, that Lentz had asked her if she was watching the O.J. Simpson trial and told

her that "O.J. could happen again" and that if he (Lentz) got to her, "there would be

no body,"

(iii)    Doris' statement to Arlington County Police officer Chris Bibro in June 1995 that

Lentz told her that "O.J. had the right idea,"

(iv)     Doris' statement to her boyfriend, Tim O'Brien, that Lentz told her in the course of

the O.J. Simpson trial that "it could happen again,"

(v)      Doris' statement to nurse Ruth Cauvin at some point between 1989 and 1991 that if

anything ever happened to her (Doris), "Jay did it," and

(vi)     Doris' statement to nurse Ann Sarkes in 1995 that "if I ever end up dead, tell the cops

he (Jay) did it."[6]

The original trial judge determined that none of these six statements were admissible under

Rule 804(b)(6)'s forfeiture by wrongdoing exception where, as here, the statements sought to be

introduced were those of the decedent victim for whose death the defendant is on trial.  The trial

judge held, alternatively, that even if the statements qualified under an applicable hearsay exception,

they should nonetheless be excluded under Rule 403, Fed. R. Evid., given that their probative value

was substantially outweighed by the danger of unfair prejudice.  The government thereafter filed a

motion for reconsideration, asking the trial judge to reconsider its Rule 403 determination, or

---

[6]     The first four of these statements are referred to, collectively, as the "O.J. statements,"
while the fifth and sixth are referred to as the "Jay did it" statements.

alternatively to consider making redactions to the statements to remove any perceived inflammatory language. The trial judge denied the government's motion to reconsider the day before the trial was scheduled to begin and the government thereafter invoked 18 U.S.C. § 3731 to file an interlocutory appeal challenging the exclusion of these statements.

The Fourth Circuit subsequently affirmed the trial judge's ruling by a divided vote in *United States v. Lentz*, 58 Fed. Appx. 961, 2003 WL 253949 (4th Cir. Feb. 6, 2003) (*Lentz I*). Specifically, Judge Michael affirmed the exclusion of Doris' out-of-court statements using solely a Rule 403 analysis, finding that the trial judge's exclusion of the statements as unduly prejudicial was not a clear abuse of discretion.[7] Judge Traxler, in a concurring opinion, declined to reach the Rule 403 question, holding instead that the statements were inadmissible under Rule 804(b)(6)'s forfeiture by wrongdoing exception to the hearsay rule. In so holding, Judge Traxler, like the original trial judge, concluded that the reasoning of Rule 804(b)(6) could not be extended to allow the introduction of statements made by a decedent victim for whose death the defendant is on trial, noting that "I interpret the Rule 804(b)(6) exception as being generally limited to the introduction of hearsay statements in the proceeding at which the deceased was expected by the assailant to testify." *Lentz I*, 58 Fed. Appx. at 968 (Traxler, J., concurring). Judge King, in a separate opinion, concurred with the decision of his colleagues that the trial judge had acted within his discretion in excluding the two "Jay did it" statements under Rule 403, but dissented from both Judge Michael and Judge Traxler as to the four O.J. statements. In this regard, Judge King noted that the O.J. statements are "plainly relevant and necessary to the Government's case; and to the extent they are prejudicial to Lentz's

---

[7] Significantly, Judge Michael declined to reach the Rule 804(b)(6) analysis, noting instead that "[t]he forfeiture by wrongdoing issue is a challenging one. We do not decide it, however, because we are divided in approach." *Lentz I*, 58 Fed. Appx. at 964-65.

defense, that prejudice is entirely self-inflicted." *Id.* at 969.  Thus, applying an abuse of discretion standard, Judge King concluded that "I would hold that the district court abused its discretion in excluding the O.J. statements under Rule 403.*" Id.*  He therefore would have remanded the matter to the trial judge to give the government the opportunity to establish by a preponderance of the evidence that Lentz engaged in "wrongdoing that was intended to, and did, procure the unavailability of [Doris] as a witness" in accordance with Rule 804(b)(6), Fed. R. Crim. P.  And, in this regard, Judge King disagreed with Judge Traxler's limitation on the application of Rule 804(b)(6), stating instead that "[t]he forfeiture by wrongdoing exception is couched in general terms, and those terms do not confine the admissibility of a hearsay statements to the particular proceeding for which the wrongdoer intended to render the declarant unavailable." *Lentz I*, 58 Fed. Appx. at 969-70.

Subsequent to *Lentz I*, the Fourth Circuit established in *United States v. Gray*, 405 F.3d 227, 240-43 (4th Cir. 2005) that Judge King's interpretation of Rule 804(b)(6) in *Lentz I* was correct, namely that "Rule 804(b)(6) applies whenever the declarant is unavailable as a witness against the defendant, without regard to the nature of the charges at the trial in which the declaring's statements are offered." *Id.* at 241.  Thus, *Gray* makes clear that to admit Doris' statements at trial under the forfeiture by wrongdoing exception, this Court need only find, by a preponderance of the evidence, (i) that Lentz engaged in some wrongdoing, (ii) that was intended, at least in part, to procure Doris' unavailability as a witness and (iii) that did, in fact, procure her unavailability as a witness.  *Gray*, 405 F.3d at 243; *see also United States v. Rivera*, 292 F. Supp. 2d 827, 833 (E.D. Va. 2003).

Because the affirmance in *Lentz I* was based on two separate and disparate opinions, one of which was based on an interpretation of Rule 804(b)(6) which is no longer valid in light of subsequent circuit authority to the contrary, the panel's ruling in *Lentz I* is neither binding nor

controlling under the law of the case doctrine or the mandate rule.  *See Aramony*, 166 F.3d at 661

(recognizing that the decision of an appellate court is not binding in a subsequent proceeding in the

same case if controlling authority has since made a contrary decision of law applicable to the issue).

It is therefore necessary and appropriate to reconsider the admissibility of the statements at issue.

At the outset, a distinction must be drawn between the four so-called O.J. statements and the

two "Jay did it" statements.  Indeed, the former are statements originally made by Lentz to Doris,

which Doris later repeated to others, while the latter are merely expressions by Doris to others of her

own opinion and subjective fear of Lentz.  The O.J. statements thus qualify as an exception to the

hearsay rule as admissions made by a defendant,[8] while the "Jay did it" statements clearly do not.

To the contrary, given that the latter are merely speculative comments about what Doris believes

might happen to her in the future, the two "Jay did it" statements are not probative of the charged

offense and are thus inadmissible in the instant case, regardless of whether or not they otherwise fall

under an exception to the hearsay rule.  It should also be noted that there is a wealth of additional

evidence in the government's case concerning Doris' alleged fear of Lentz, further rendering

introduction of the two "Jay did it" statements unnecessary as cumulative.  *See* Rule 403, Fed. R.

Evid.

The four O.J. statements stand on different footing.  Thus, given that these particular

statements initially qualify as admissions of a party defendant, the next step in the analysis requires

a determination as to whether the statements are admissible under the forfeiture by wrongdoing

exception set forth in Rule 804(b)(6), Fed. R. Evid.  It is now unmistakably clear that to fall within

---

[8]   *See* Rule 801(d)(2), Fed. R. Evid. (providing that a statement is not hearsay if it is offered
against a party and is the party's own statement).

this exception, "the government need prove that the defendant engaged or acquiesced in wrongdoing that led to the witnesses unavailability by only a preponderance of the evidence." *United States v. Rivera*, 412 F.3d 562, 567 (4th Cir. 2005) (citing *Gray*, 405 F.3d at 241).  This is true regardless of whether the defendant happens to be on trial for the murder of the unavailable declarant, as here. To satisfy the Rule 804(b)(6) standard in this regard, it would be inappropriate to rely simply on the fact of the instant prosecution, as the issuance of the indictment was based on a finding by the grand jury and not the trial judge.  It is also insufficient to rely exclusively on the Fourth Circuit's finding that the evidence presented in the course of the first trial was sufficient to submit the charged offense to the jury, although this recognition is certainly a relevant factor in the analysis.  *See Lentz II*, 383 F.3d at 203 (concluding that "the evidence presented in the course of the first trial was sufficient for the properly instructed jury to convict Lentz of kidnapping resulting in murder").  Instead, this Court must make an independent finding as to whether the government has established by a preponderance of the evidence that Lentz engaged in or acquiesced in wrongdoing that led to Doris' unavailability, as required for application of the Rule 804(b)(6) exception to the hearsay rule.

A review of the trial record establishes, *inter alia*, the following facts by a preponderance of the evidence:

1.     Lentz was physically and verbally abusive toward Doris throughout their marriage.

2.     A number of child support, child support arrearage, and marital property distribution issues continued to be the subject of bitter litigation in family court following the couple's divorce in 1995.

3.     Lentz told two co-workers that he would kill Doris before he let her have custody of their child.[9]

---

[9]     These statements are not the O.J. statements in issue here and were admitted by the original trial judge in the course of the first trial.

4.      Doris told several individuals that she was going to pick up her daughter at Lentz's home on the evening of April 23, 1996.

5.      Lentz told a babysitter that Julia would not be returning on the evening of April 23, 1996, due to a ticketing mix-up, but that Doris had come to pick her up anyway; there was no evidence that the airline had ever made a ticketing mistake.

6.      Doris and Lentz were scheduled to appear at a hearing in family court on the morning of April 24, 1996.

7.      Doris did not appear at the April 24, 1996 state court hearing.

8.      Doris' abandoned car was located by authorities on April 28, 1996, in a District of Columbia parking lot on a route between the homes of the estranged couple, approximately eight miles from Lentz's home.

9.      The individual who had reported the abandoned vehicle said that she first saw it there on April 24, 1996.

10.     The doors of the vehicle were unlocked, Doris's purse was in plain view, and the keys were on the passenger side floor.

11.     The driver's seat of the vehicle was in a position farthest back from the steering wheel, which would have accommodated a tall driver such as Lentz, who is six feet tall, but not Doris, who was a little more than five feet tall.

12.     The interior of the vehicle and the trunk area were dirty and there were blood stains on the passenger side of the vehicle.  The floor mats and Julia's booster seat were missing from the vehicle and there were two umbrellas in the back seat, one for an adult and one for a child.

13.     Two witnesses who rode in Doris' car the day before her disappearance testified that the interior of the car had then been completely clean and stain-free, the booster seat had been in the back of the vehicle, and no umbrellas were observed in the car at that time, although it rained heavily on the evening of April 23, 1996.

14.     Subsequent testing revealed that although nearly all of the blood stains found in the vehicle contained Doris's DNA, one contained a match for Lentz's DNA.

15.     Doris purchased her vehicle after she and Lentz separated and he had not had access to the vehicle.

16.    Lentz requested that his mail delivery be stopped indefinitely, effective April 24, 1996.

17.    Lentz also left a message with his real estate agent, Diane Ives, on April 22, 1996, asking her to remove the lockbox from his home because he wanted to do some interior painting. When Ives later arrived at the home to remove the lockbox on April 23, 1996, she observed a large blue tarp in the foyer but no painting supplies.

18.    Ives later replaced the lockbox on April 27, 1996, but Lentz called her and demanded that she remove it again. When she returned to the home, Ives noticed that the blue tarp was gone, but no interior painting had been done, and a small square on the floor of the carport had been freshly painted gray.

19.    Ives returned to the house on April 29, 1996, and noticed that the painted area in the carport had more than doubled in size. By May 10, the entire back third of the driveway had been painted gray. The interior of the home was never painted.

20.    Two police officers driving by the residence within several days of Doris' disappearance observed Lentz washing the floor of his carport with a garden hose.

21.    During a visit to Lentz's home in June 1996, Doris' mother noticed that the carpeting had been replaced or very well-cleaned, the living room sofa was missing, and a matching chair had been moved to where the sofa had previously been placed.

All of these factors, combined with the fact of the instant indictment and the Fourth Circuit's recognition that the evidence introduced in the course of the first trial was sufficient to submit the case to the jury,[10] establish by more than a preponderance of the evidence that Lentz engaged in wrongdoing that was intended, at least in part, to procure Doris' unavailability as a witness and that did, in fact, procure her unavailability as a witness. *See Gray*, 405 F.3d at 242 (recognizing that in applying Rule 804(b)(6), "we have held that a defendant need only intend 'in part' to procure the declarant's unavailability"). The four O.J. statements at issue are therefore admissible in Lentz's retrial as an exception to the hearsay rule under Rule 804(b)(6), Fed. R. Evid.

---

[10]    Significantly, the instant Rule 804(b)(6) analysis does not take into consideration any of the evidence at issue in either this Memorandum Opinion or in the recent under seal Memorandum Opinions issued in this case.

Nor is this ruling altered by Lentz's argument that the O.J. statements are unduly prejudicial. Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Rule 403, Fed. R. Evid. (Advisory Committee Note). Thus, exclusion is warranted on this ground only where there is "a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence."  *United States v. Wells*, 163 F.3d 889, 896 (4th Cir. 1998).

Here, while the O.J. statements are indeed damaging to Lentz's case, they are nonetheless "highly probative of Lentz's commission and concealment of Doris' murder."  *Lentz I*, 58 Fed. Appx. at 969.[11]  To be sure, evidence that is highly probative of the charged offense "invariably will be prejudicial to the defense" and legitimate "damage to a defendant's case is not a basis for excluding probative evidence."  *United States v. Grimmons*, 137 F.3d 823, 833 (4th Cir. 1998).  It is also significant to note that any potential prejudice arising out of the statements is entirely self-inflicted, as "Lentz himself chose to make reference to O.J. Simpson in his threats to Doris." *Lentz I*, 58 Fed. Appx. at 969.[12]  Moreover, despite Lentz's arguments to the contrary, the statements at

---

[11]   *See also Mullen  v. Princess Anne Volunteer Fire Company, Inc.*, 853 F.2d 1130, 1135 (4th Cr. 1988) (noting that "[j]ury trials are not antiseptic events...upsetting facts may well emerge. The general policy of the Federal rules, however, is that all relevant material should be laid before the jury as it engages in the truthfinding process");  *United States v. Wells*, 163 F.3d 889, 896 (4th Cir. 1998) (noting that "[w]e generally favor admissibility").

[12]   Indeed, as Judge King correctly noted in *Lentz I*:

> [t]o hold a defendant's own threats are so egregiously prejudicial as
> to preclude their admission against him at trial would create a
> perverse result:  As between two defendants who have made threats
> against the individuals in whose deaths they are subsequently
> charged, he who has made the more odious statements can, by virtue
> of the very extremity of his conduct, be shielded at trial from
> inferences deleterious to his case.  By contrast, the defendant whose

15

issue are devoid of any particularly inflammatory language, especially where, as here, there is no racial aspect to the instant case whatsoever.[13]   Accordingly, for these reasons, the O.J. statements are clearly admissible and the government may offer the statements as evidence against Lentz in the course of the retrial.

B.      Testimony of Mary Ann Petrone

The government next seeks to introduce the testimony of Mary Anne Petrone, Lentz's alleged girlfriend at the time of Doris' disappearance, to establish, *inter alia*, (i) that "Lentz was strong...[and] did not appear to have any physical problems," and (ii) that Petrone typically spoke with Lentz every day, but that she did not hear from him on either April 23 or 24, 1996.  Specifically, the government contends that Petrone would testify that she began dating Lentz in October 1995, that she was dating him at the time Doris disappeared in April 1996, and that Lentz picked her up in his arms and carried her on several occasions throughout this time frame.  According to the government, this testimony is relevant to show that Lentz was not only physically capable of committing the charged crime, but also that he gave a false exculpatory statement to Agent Brad Garrett in October 1996 when he claimed to be unable to lift anything heavier than 8 to 10 pound barbells due to a

---

threats were comparatively milder may suffer the introduction of those statements against him.

*Lentz I*, 58 Fed. Appx. at 969-70.

[13]      It is of course true, as the government properly concedes, that it is sometimes necessary for a trial court to redact or alter inflammatory language contained in a statement or other evidence presented in the course of a trial or to provide a cautionary or limiting instruction to the jury to lessen any potential prejudicial effect of certain evidence.  *See United States v. Mohr*, 318 F.3d 613, 621 (4th Cir. 2003); *Aramony*, 88 F.3d at 1378.  Yet, in this instance, it is not at all clear that such a redaction or instruction would be appropriate given the circumstances.  The parties may, however, submit a suggested redaction or instruction in this regard prior to trial should they wish to do so.

shoulder injury.[14]  Petrone is also expected to testify that Lentz typically called her on the telephone every day, but that he did not call her on either April 23 or 24, 1996, the day of and the day after Doris' disappearance.  She would further testify that when Lentz finally called her on April 25, 1996, he told her that Doris had not shown up for a court hearing and that he thought she'd had car trouble.

The original trial judge excluded Petrone's testimony entirely in the course of a mid-trial ruling on grounds of relevancy and under Rule 403, Fed. R. Evid.  Specifically, the trial judge concluded that the proffered testimony, which included matters in addition to those sought to be admitted here,[15] did not "seem[] to be relevant" or "probative of any issue concerning whether Mr. Lentz was the agent responsible for Mrs. Lentz's disappearance and kidnapping resulting in death." *See United States v. Lentz*, 1:01cr150 (E.D. Va. June 10, 2003) (Transcript, p. 205).  He then added that some of the proffered evidence would be confusing to the jury and a waste of time, and that the matters as to which Petrone was to testify about were "marginal matters that have no probative value whatsoever." *See id.*  Immediately following this ruling, the government sought permission to call

---

[14]     It is clear that "[a] defendant's false exculpatory statement is admissible at trial to show his consciousness of guilt." *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989); *United States v. Rahseparian*, 231 F.3d 1257, 1263 (10th Cir. 2000); *United States v. Quiroz*, 13 F.3d 505 (2d Cir. 1993) (noting that "[a] defendant's false exculpatory statement is admissible at trial to show his consciousness of guilt, and may be an important part of the government's proof").

[15]     For example, in the course of the first trial, the government proffered that Petrone would also testify (i) that Lentz had previously expressed bitterness toward Doris, (ii) that Lentz was very upset, (iii) that on April 26, 1996, Lentz was sitting on the floor of her house with his arms around his knees, rocking back and forth, which she had never before seen him do, and that when she asked him if anything was wrong, he responded that he did not want to talk about it, (iv) that the Saturday before Doris disappeared, Lentz picked up a pair of yellow Platex wash gloves in the kitchen of Petrone's house and stared at them for approximately a minute with a strange expression on his face, and (v) that she was interviewed by the FBI at her home in September 1996, while she was still dating Lentz, and that Lentz subsequently took the business cards that the FBI agents had left at her home.

Petrone for the limited purpose of allowing her to testify that Lentz had previously picked her up without any apparent difficulties, arguing that this testimony was sufficient to impeach Lentz's statement to Officer Garrett regarding his alleged physical limitations.  The trial judge then summarily denied the government's motion to reconsider the admissibility of the testimony, stating only that "I appreciate the motion to reconsider.  But, it's denied."  *See id.* at p. 235.

At the outset, it should be noted that Petrone's proffered testimony appears to have some relevance in this case, contrary to the original trial judge's conclusion.  Indeed, evidence is relevant if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Rule 401, Fed. R. Evid.  Here, Petrone's testimony certainly appears to be relevant to several facts that are arguably "of consequence to the determination of the action," such as Lentz's physical ability to commit the charged offense, as well as his lack of contact with his girlfriend at and around the time of Doris' disappearance.

Even so, despite the potential relevance of Petrone's proffered testimony to the instant case, there is still no good reason to disturb the original trial judge's discretionary ruling excluding the evidence on Rule 403 grounds.  To be sure, although this Court might conclude differently on the Rule 403 analysis, it cannot be said that the original trial judge's ruling was clearly erroneous such that it would amount to a manifest injustice to require the parties to be bound by the original ruling in the course of the retrial.  *See Christianson*, 486 U.S. at 817 (recognizing that "a court has the power to revisit prior decisions of its own or of a coordinate court in any circumstances, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice").  For this

18

reason, the original trial judge's discretionary Rule 403 ruling on the issue of Petrone's testimony

is appropriately treated as the law of the case and the government is thus precluded from introducing

her testimony in its case in chief in the course of Lentz's retrial.[16]

     C.    The Missing Person Poster

The government next seeks to introduce a missing person poster that was posted and handed

out in Lentz's neighborhood on the Saturday and Sunday after Doris disappeared, arguing

specifically that the poster constitutes evidence of Lentz's consciousness of guilt in light of the fact

(i) that he was seen removing the posters from the neighborhood, and (ii) that he changed his story

with the police regarding the last time he spoke with Doris after seeing certain information included

on the poster.  In support of its argument in this regard, the government proffers the following facts:

On April 25, 1996, Lentz told Arlington County Detective John Coale that he had called Doris on

April 23, 1996, between 5:00 and 6:00 p.m., and that he had then told her not to come to his house

to pick up Julia that evening since Julia was not returning from Indiana that day.  The following day,

April 26, 1996, Lentz returned a telephone call to Arlington County Detective Jane Morris and

advised her, too, that he had last spoken with Doris between 5:00 and 6:00 p.m. on April 23, 1996,

when he allegedly told Doris that Julia would not be returning home until Thursday.

On Saturday and Sunday, April 27 and 28, 1996, various citizens and Arlington County

police officers distributed and posted an 8 ½ x 11 missing person poster in Lentz's neighborhood

that bore a color photograph of Doris.  The poster also provided a brief physical description of Doris

and contained a small amount of additional text, including the statement that "Doris disappeared

---

[16] This ruling may, of course, be reconsidered in the midst of the retrial should additional circumstances become apparent that warrant such reconsideration.

around 7 p.m., Tuesday, April 23, 1996 after telling a friend that she was going to Ft. Washington, Maryland to pick up her daughter." While the posters were being hung in Lentz's neighborhood on Saturday, April 27, a witness apparently observed Lentz removing the posters and declaring, "Don't be putting those up around here."

At 11:57 p.m. on Sunday evening, April 28, 1996, Lentz left the following voice mail message on Detective Jane Morris' answering machine:

> This is Jay Lentz, it's Sunday night. I was able to think and reconstruct, last Tuesday, my wife had called me right around ten till 7, because she said she was getting ready to head out and that's just when I made sure to confirm to her that my daughter was coming in Thursday night, and that's when I mentioned that there was no need for her to come on over.

In the course of the first trial, defense counsel proffered that Lentz had removed the posters from his neighborhood to prevent five-year-old Julia from seeing the posters depicting her mother. The original trial judge excluded evidence of the missing person poster in its entirety. Specifically, the original trial judge did not accept the government's proffer that Lentz's removal of the posters could be viewed as evidence of consciousness of his guilt, stating that "I don't think it tends to prove whether or not he was involved in criminal activity." *See United States v. Lentz*, No. 01cr150 (E.D. Va. June 5, 2003) (Transcript, p. 73). The trial judge further concluded that the prejudicial effect of the poster was substantial and would require a response from the defendant as to his reasons for removing the posters. *See id.* In summary, the trial judge concluded as follows:

> All these things lead me to conclude that this is — this is the outer limits of circumstantial evidence that has probative value. I think that the probative value here is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and also, I just stated that the inference that is being attempted to be made here is far reaching, and I do not find any basis to conclude that it's evidence of

20

> consciousness of guilt.  And, so for those reasons, I'm going to
> exclude testimony concerning the missing person's poster.  The
> posters themselves will not be presented to the jury.  And, there will
> be no testimony about what, if anything, Mr. Lentz may or may not
> have done concerning missing person's posters.

*Id.* at 74.  The trial judge thereafter declined to alter this ruling when the government later requested

permission to introduce the poster for the limited purpose of establishing that Lentz had changed his

story with the police after observing the poster.  Specifically, the trial judge again ruled that the

poster was still more prejudicial than probative under Rule 403, particularly given that the same

information contained on the poster regarding when Doris had last been heard from had been

broadcast in television and newspaper reports at around the same time, including a television news

report on Friday, April 26, 1996.

Analysis of the missing person poster evidence must be broken down into two distinct

prongs, the first pertaining to Lentz's alleged act of removing the posters from his neighborhood, and

the second pertaining to Lentz's alleged act of changing his story with the police after viewing the

poster.  As to the first of these two prongs, it seems clear that removing a missing person poster

might reasonably be viewed as evidence of a defendant's consciousness of guilt, despite the original

trial judge's apparent ruling to the contrary.[17]  Indeed, it is fair to infer that a person who committed

---

[17]   In this regard, the record is somewhat unclear as to whether the original trial judge held
definitively that the evidence surrounding the missing person poster was not probative of Lentz's
consciousness of guilt.  For example, the original trial judge stated on one occasion in the course of
his bench ruling that "I don't think it tends to prove whether or not he was involved in criminal
activity," thus implying that he found no probative value in the evidence whatsoever.  *See United
States v. Lentz*, No. 01cr150 (E.D. Va. June 5, 2003) (Transcript, p. 73).  The original trial judge later
reiterated that "I do not find any basis to conclude that it's evidence of consciousness of guilt."  *Id.*
Yet, he also made the somewhat inconsistent statement from the bench that evidence concerning the
poster was on the "outer limits of circumstantial evidence that has probative value...[which] is
substantially outweighed by the danger of unfair prejudice."  *Id.*

a kidnapping and murder might remove a missing person poster publicizing the victim's disappearance because he would not want to do anything that might encourage his neighbors to remember or report to the police anything that they may have observed in this regard.[18]   To be sure, there may have been other reasons for Lentz to remove the posters, and one such reason is proffered by Lentz's counsel in this instance, namely that Lentz wanted to shield his young daughter from observing the posters of her missing mother.   But to weigh or compare the probabilities of these two possible explanations and then to determine that the act of removing the posters is not evidence of Lentz's consciousness of guilt because defense counsel's proffered explanation is equally probable is not the proper standard under Rule 401, Fed. R. Evid.[19]   Instead, the proper standard is simply whether the evidence of removing the missing person posters has a tendency to reflect Lentz's consciousness of guilt, not that it does, in fact, prove such guilt or that guilt is more probable than some other inference.[20]   Indeed, under Rule 401, Fed. R. Evid., evidence is relevant if it "has *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   (Emphasis added).   Thus,

---

[18]   *See, e.g., United States v. Young*, 248 F.3d 260 (4th Cir. 2001) (discussing evidence probative to a defendant's consciousness of guilt).

[19]   Worth noting is that the proffered explanation argued by Lentz's counsel is just that — a proffer; it is not evidence.   In any event, the weighing of evidence, including the probabilities of inferences to be drawn from such evidence, should be conducted by the jury, not the trial judge, provided the evidence is otherwise relevant. *See, e.g., United States v. Cogell*, 844 F.2d 179 (4th Cir. 1988) (approving a jury instruction stating, *inter alia*, that "whether or not evidence as to a defendant's voluntary explanation or statement points to a consciousness of guilt and the significance to be attached to any such evidence are matters exclusively within the province of the jury").

[20]   The fact that the evidence of removing the posters might beg a response from Lentz in this instance is irrelevant to the Rule 401 analysis.   Virtually all evidence probative of guilt arguably begs a response from a defendant and to exclude evidence on this basis would be nonsense.

because the act of removing the posters is clearly relevant and probative to a "fact that is of consequence" in this matter under Rule 401, Fed. R. Evid. — namely to Lentz's consciousness of guilt — it is next necessary to conduct an independent Rule 403 analysis of the proffered evidence.

Here, careful consideration of the issue compels the conclusion that the probative value of the evidence pertaining to Lentz's removal of the missing person posters is substantially outweighed by the danger of unfair prejudice.  Particularly pertinent here is that unfair prejudice can arise where the offered evidence presents a "genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Van Metre*, 150 F.3d 339, 351 (4th Cir. 1998) (citing *United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995)).  The danger of unfair prejudice arises in this instance from the fact that the jury might conclude, inappropriately, that Lentz is simply a bad person or a heartless and uncaring individual because he removed the missing person posters publicizing the disappearance of his ex-wife.  And, because the potential of such an emotional response substantially outweighs the probative value of the evidence in question, the original trial judge's exclusion of the evidence concerning Lentz's removal of the missing person posters on Rule 403 grounds was not clearly erroneous.  The original ruling is thus appropriately viewed as the law of the case to this extent and the government accordingly may not offer this specific item of evidence in the course of the retrial.  *See Christianson*, 486 U.S. at 817.

The Rule 401 and 403 calculus on the second prong of the missing person poster analysis yields a different result.  Here, again, the proffered evidence — namely, that Lentz changed his story with the police regarding the last time he spoke with Doris after viewing the information contained on the poster — is relevant and reasonably probative of Lentz's consciousness of guilt under Rule

401, Fed. R. Evid., despite the original trial judge's apparent ruling to the contrary.  Indeed, it is reasonable to infer that a person who has committed a kidnapping and murder might wish to change his story or alibi to coincide with other evidence learned or publicized by law enforcement officers regarding the offense in issue.  And, to exclude the proffered evidence on the ground that the information contained on the poster was likewise broadcast in the media in various contemporaneous television and news reports, as the original trial judge did, would be improper, as there is no corresponding evidence to establish that Lentz actually viewed any such television and news reports.  There is definitive evidence, however, establishing that Lentz viewed the missing person poster prior to changing his story with the police regarding the last time he spoke with Doris.  Additionally, to allow this limited fact into evidence, excluding any reference to Lentz's alleged removal of the missing person posters from his neighborhood, does not subject Lentz to any unfair prejudice in this instance.  For this reason, the existence of the poster and the information contained on it, together with the fact that Lentz viewed the poster prior to changing his story with the police, may be offered by the government as evidence of Lentz's alleged consciousness of guilt in the course of the retrial.

   D.   Audiotape Excerpts

   Finally, the government seeks to admit audiotape excerpts of three messages that Lentz left on Doris' telephone answering machine.[21]  According to the government, these particular audio clips represent the best and only direct evidence by which the jury can learn (i) how Lentz treated Doris, (ii) the nature of the relationship between Lentz and Doris, and (iii) the issues over which the two fought, all of which are relevant to the issues of motive and intent.

---

[21]   The record reflects that for approximately three years prior to her disappearance, Doris taped her telephone conversations with Lentz and retained messages that he left for her on her telephone answering machine.

In this respect, the original trial judge ruled that taped "phone calls are admissible under Rules 404(b) and 403 to the extent that they reveal Defendant's hostility toward Ms. Lentz after separation of the parties...However, specific excerpts from the tape recordings will be subject to challenges of relevance at trial." *Lentz*, 282 F. Supp. 2d at 434-35. Eight conversations or messages were admitted in the course of the first trial, but eleven additional requested excerpts were excluded by the trial judge as cumulative and lacking evidence of hostility or threats. The government now seeks the admission of three of the eleven excluded excerpts.

A review of these three excerpts reveals nothing particularly hostile, such that the original trial judge's exclusion of the excerpts could be considered clearly erroneous. Moreover, the excerpts are indeed cumulative of ample additional evidence illustrating the hostility between Doris and Lentz during the relevant time period. Because the original trial judge's ruling under Rule 403, Fed. R. Evid. is not clearly erroneous, and because there is no exceptional reason to alter or amend this discretionary ruling in any respect, the original ruling will stand as the law of the case in this instance. *See Christianson*, 486 U.S. at 817. The government is therefore precluded from offering the three requested audiotape excerpts in the course of the retrial.

An appropriate Order will issue.


/s/
_____
T. S. Ellis, III
United States District Judge

Alexandria, VA
August 29, 2005

25